# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| JOHN W. DEZELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:05CV1873 JCH(LMB) |
| | ) | |
| MICHAEL J. ASTRUE,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision

denying John W. Dezell's application for a Period of Disability and Disability Insurance Benefits

under Title II of the Social Security Act. The cause was referred to the undersigned United

States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b).

Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 13). Defendant

has filed a Brief in Support of the Answer. (Doc. No. 15).

## Procedural History

On December 30, 2003, plaintiff filed his application for a Period of Disability and

Disability Insurance Benefits, claiming that he became unable to work due to his disabling

---

[1]This case was originally filed against Jo Anne B. Barnhart, who was at that time
Commissioner of the Social Security Administration. On February 12, 2007, Michael J. Astrue
became the Commissioner of the SSA, and he hereby is substituted as the defendant in this action.
See Fed.R.Civ.P. 25(d)(1).

condition on September 22, 2002.[2]  (Tr. 69-74).  (Tr. 15).  This claim was denied initially, and

following an administrative hearing, plaintiff's claim was denied in a written opinion by an

Administrative Law Judge (ALJ), dated August 11, 2005.  (Tr. 10-20).  Plaintiff then filed a

request for review of the ALJ's decision with the Appeals Council of the Social Security

Administration (SSA), which was denied on September 26, 2005.  (Tr. 8, 4-6).  Thus, the

decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981,

416.1481.

## Evidence Before the ALJ

### A.      ALJ Hearing

Plaintiff's administrative hearing was held on June 29, 2005.  (Tr. 309).  Plaintiff was

present and was represented by counsel.  (Id.).

The ALJ examined plaintiff, who testified that he lived with his wife and his eighteen-year-

old daughter.  (Id.).  Plaintiff stated that he was forty-nine years of age and that he received his

GED.  (Tr. 309-10).  Plaintiff testified that he was seventy inches tall and weighed 230 pounds.

(Tr. 310).  Plaintiff stated that his normal weight is about 180 pounds, and that he had been

gaining weight as he aged.  (Id.).  Plaintiff testified that he was right-handed.  (Id.).

Plaintiff testified that he last worked in September of 2003, as a press operator.  (Tr. 310-

11).  Plaintiff stated that he quit working on that date because he was injured at work.  (Id.).

Plaintiff testified that he was unable to work at the time of the hearing due to his disability.  (Tr.

311).  Plaintiff stated that he does not receive veteran's disability benefits, although he applied for

---

[2]Plaintiff's insured status under Title II of the Act expired on September 30, 2003.
(Tr. 13-14).

benefits.  (Tr. 312).

Plaintiff testified that he is unable to work because he has a bad back.  (Id.).  Plaintiff also stated that his left leg swells due to a blood clot.  (Tr. 313).  Plaintiff explained that the blood clot was caused by the work injury, which occurred about a year prior to the hearing.  (Id.).  Plaintiff testified that he can walk, although he has to sit down occasionally due to the swelling.  (Id.).

Plaintiff testified that he has problems with both of his shoulders.  (Tr. 313-14).  Plaintiff stated that he underwent surgery.  (Tr. 314).

Plaintiff testified that he also has a heart problem.  (Id.).  Plaintiff stated that he suffered a heart attack, and that he has not undergone heart surgery.  (Id.).  Plaintiff testified that he takes several different medications for his heart condition.  (Id.).  Plaintiff stated that he takes nitroglycerin[3] every morning by placing a tablet under his tongue.  (Tr. 315).

Plaintiff testified that he does not drive.  (Id.).  Plaintiff stated that he has no hobbies, other than washing dishes.  (Id.).  Plaintiff testified that he does not attend church.  (Id.).  Plaintiff stated that his wife works at a daycare center.  (Tr. 316).  Plaintiff testified that he goes to the grocery store about once a month.  (Id.).

Plaintiff testified that he can stand for about fifteen minutes before his legs "go in."  (Id.).  Plaintiff stated that he can sit down for about a half-hour before he has to stand up.  (Id.).  Plaintiff testified that he can walk one to two blocks before he has to stop.  (Id.).  Plaintiff stated that he can lift ten to twenty pounds.  (Tr. 317).

---

[3]Nitroglycerin is indicated for the prevention of angina pectoris due to coronary artery disease.  See Physician's Desk Reference (PDR), 3047 (61st Ed. 2007).

Plaintiff's attorney then questioned plaintiff, who testified that he has two stents[4] in his arteries. (Id.). Plaintiff stated that the stents were put in in February of 2005, and April of 2005. (Id.). Plaintiff testified that his doctor told him he would have to undergo surgery if the stents were not effective. (Id.).

Plaintiff stated that he has been experiencing chest pain every morning since the stents were put in. (Id.). Plaintiff testified that the Nitroglycerin relieves his chest pain in about three minutes. (Id.). Plaintiff stated that he experiences chest pain during the day if he engages in activity such as washing dishes. (Tr. 318). Plaintiff testified that he sits down and takes a Nitroglycerin pill at the onset of chest pain. (Id.). Plaintiff described his chest pain as a pin sticking sensation, accompanied by a rapid heart beat. (Id.). Plaintiff stated that the pain also goes down his left arm. (Id.).

Plaintiff's attorney indicated that he had submitted reports from plaintiff's cardiologist. (Id.). Plaintiff's attorney also stated that he would submit a brief to the ALJ. (Id.).

## B.  **Relevant Medical Records**

Plaintiff presented to Jeff D. Almand, M.D., on October 3, 2002, with complaints of pain in his right shoulder and left calf. (Tr. 171). Plaintiff reported that he fell four feet off a bench while at work. (Id.). Upon physical examination, Dr. Almand found that plaintiff had full range of motion of the cervical spine[5] with no tenderness or pain. (Id.). Right shoulder examination

---

[4]A device placed in a body structure to provide support and keep the structure open. See Stedman's Medical Dictionary, 1696 (27th Ed. 2000).

[5]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra.

revealed that plaintiff lacked 50 degrees of forward flexion and 30 degrees of abduction when compared to the opposite side. (Id.). Plaintiff had pain and crepitation to range of motion of his right shoulder with a positive impingement[6] sign and positive drop arm test. (Id.). He otherwise had full range of motion, full strength and normal sensation through the remainder of his right upper extremity. (Id.). Examination of plaintiff's left calf revealed swelling in the ankle and calf, tenderness in the posterior calf, with a questionable positive palpable cord as well as a possible questionable Homan sign.[7] (Id.). Radiographs of plaintiff's shoulder and knee were unremarkable. (Id.). Dr. Almand scheduled an MRI of plaintiff's shoulder to rule out rotator cuff tear and a venogram[8] to rule out deep vein thrombosis[9] in his left lower extremity. (Id.).

Plaintiff was admitted to South Sunflower County Hospital on October 3, 2002, after a venogram revealed multiple small filling defects[10] in the anterior tibial[11] and perineal[12] veins of his

_____

The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

[6]Impingement results from pressure on the rotator cuff from part of the shoulder blade as the arm is lifted. See Stedman's at 1157.

[7]Pain in the calf when the ankle is slowly and gently flexed with the knee bent, indicative of thrombosis in the veins of the knee. See Stedman's at 1638.

[8]Radiographic demonstration of a vein, after the injection of contrast medium. Stedman's at 1951.

[9]Clotting within a blood vessel which may cause infarction of tissues surrounded by the vessel. Stedman's at 1831.

[10]Displacement of contrast medium by a space-occupying lesion in a radiographic study of a contrast-filled hollow viscus. Stedman's at 464.

[11]Relating to the shin bone. See Stedman's at 1835.

[12]Relating to the area between the thighs extending from the coccyx to the pubis and lying below the pelvic diaphragm. See Stedman's at 1349.

lower extremity. (Tr. 133). Plaintiff was discharged on October 14, 2002, at which time his final diagnosis was: left lower extremity deep vein thrombosis, on Coumadin[13] therapy, and right shoulder pain. (Id.). Michael Montesi, M.D., indicated that plaintiff's condition was stable and he was well anticoagulated.[14] (Id.). Dr. Montesi noted that plaintiff had full range of motion of his lower extremities, with some pain with manipulation of active and passive range of motion of his right shoulder, but good sensation in strength in the lower extremities. (Id.). Plaintiff was advised to stay off work for a week, at which time he would be reevaluated. (Tr. 134).

Plaintiff saw Dr. Montesi for follow-up on October 21, 2002, and on October 28, 2002, at which time it was noted that plaintiff was doing well, although his compliance with medication was questioned. (Tr. 179). On February 5, 2002, Dr. Montesi saw plaintiff for a preoperative evaluation. (Id.). Dr. Montesi indicated that plaintiff was scheduled to undergo right shoulder surgery with Dr. Almand. (Id.). Plaintiff's bilateral lower extremities showed no significant edema,[15] tenderness, or palpable cords. (Id.). Dr. Montesi scheduled a lower extremity venogram to make sure his clot cleared. (Id.).

Plaintiff underwent a left leg venogram on February 5, 2003, which revealed improvement in appearance since plaintiff's last examination on October 10, 2002, with opacification[16] of multiple incompetent perforating veins in the center of the leg, filling superficial veins of the leg,

---

[13]Coumadin is an anticoagulant indicated for the treatment of venous thrombosis. See PDR at 898-99.

[14]Preventing clotting. See Stedman's at 99.

[15]An accumulation of an excessive amount of watery fluid in cells or intercellular tissues. Stedman's at 566.

[16]The process of making opaque. Stedman's at 1263.

knee and thigh most likely post phlebitic[17] in origin.  (Tr. 157).

Plaintiff underwent right shoulder surgery on February 10, 2003.  (Tr. 170).  Dr. Almand's preoperative diagnosis was rotator cuff tear, right shoulder; anterior glenoid labral[18] tear.  (Id.). Plaintiff underwent a diagnostic arthroscopic subacromial decompression[19] with arthroscopic assisted acromioplasty[20] and arthroscopic distal clavicle excision,[21] and mini-open rotator cuff repair.  (Id.).

Plaintiff saw Dr. Montesi on March 17, 2003.  (Tr. 178).  Plaintiff reported some left lower extremity pain.  (Id.).  Dr. Montesi noted that plaintiff smelled of alcohol and that plaintiff drank on a regular basis.  (Id.).  Dr. Montesi stated that plaintiff was noncompliant with follow-up and noncompliant with his Coumadin therapy.  (Id.).  Dr. Montesi noted that plaintiff was in rehab for his shoulder and appeared to be tolerating it well.  (Id.).  Dr. Montesi's assessment was left lower extremity pain and xerosis.[22]  (Id.).

On March 31, 2003, Dr. Montesi stated that plaintiff appeared to be slightly intoxicated although he denied alcohol use.  (Id.).  Plaintiff reported that he quit going to physical therapy after two weeks and he cannot lift his arm.  (Id.).  Plaintiff indicated that superficial pain in the left

---

[17]Inflammation of a vein.  Stedman's at 1368.

[18]A ring of fibrocartilage in the scapula, or  shoulder blade.  See Stedman's at 749.

[19]Removal of pressure at the acromion, which is the lateral end of the spine of the shoulder blade.  See Stedman's at 18.

[20]A surgical reshaping of the acromion, frequently performed to remedy compression of the rotator cuff of the shoulder joint.  See Stedman's at 18.

[21]Removal of a portion of the clavicle, or collar bone.  See Stedman's at 360.

[22]Pathologic dryness.  See Stedman's at 1994.

lower extremity was better, although he had some tightness in his calf. (Id.). Plaintiff's lower extremities were tender just over the hamstrings and in the tendons. (Id.). Dr. Montesi's assessment was left lower extremity pain, which appeared to be muscle cramps. (Id.). He prescribed Norflex[23] and advised plaintiff to cut out the alcohol and follow-up with Dr. Almand. (Id.).

Plaintiff saw Dr. Almand for a follow-up on April 1, 2003. (Tr. 167). Plaintiff reported that he was unable to make any progress in his shoulder due to the fact that he lacked full forward elevation. (Id.). Plaintiff indicated that he had stopped his therapy because he was unable to obtain transportation. (Id.). Dr. Almand stated that he would work on arranging transportation for plaintiff. (Id.).

Plaintiff saw Dr. Montesi for a follow-up regarding his left lower extremity pain on April 14, 2003. (Tr. 177). Plaintiff had mild superficial pain when he walked. (Id.). Plaintiff reported that he was walking about three miles back and forth because he had no transportation. (Id.). Dr. Montesi noted that plaintiff was undergoing physical therapy three times a week. (Id.). Upon physical examination, plaintiff had some right shoulder pain secondary to surgery, a limited range of motion, and pain with abduction. (Id.). Plaintiff also had some very mild superficial tenderness in the calf. (Id.). Dr. Montesi's assessment was mild superficial phlebitis[24] and right shoulder

---

[23]Norflex is indicated for the relief of discomfort associated with acute painful musculoskeletal conditions. See PDR at 1856.

[24]Inflammation of a vein. Stedman's at 1368.

pain.  (Id.).  He prescribed Keflex[25] and Naproxen[26] and recommended that plaintiff continue with physical therapy.  (Id.).

On April 29, 2003, Dr. Montesi indicated that plaintiff's right shoulder was rehabilitating "pretty well."  (Tr. 176).  Plaintiff had some very minimal tenderness of the bilateral lower extremities.  (Id.).  Dr. Montesi noted that plaintiff had limited range of motion in his shoulder, although his shoulder was "markedly improved since surgery."  (Id.).

Plaintiff saw Dr. Almand for a follow-up of his shoulder on May 13, 2003.  (Tr. 166). Plaintiff reported having less pain and it was noted that he was making significant progress.  (Id.). Plaintiff indicated that overall, his shoulder was getting better each day.  (Id.).  Plaintiff complained of some pain in his elbow and intermittent inability to fully extend his knee, with some locking.  (Id.).

Plaintiff underwent x-rays of his right elbow on May 13, 2003, which revealed degenerative changes.  (Tr. 155).

On May 15, 2003, plaintiff reported that his shoulder was doing well.  (Tr. 165).  Plaintiff had some limited motion in his right elbow, with some intermittent pain and locking.  (Id.).  Upon examination, plaintiff had ten degrees of full extension of his elbow and 125 degrees of flexion. (Id.).  Radiographs of plaintiff's elbow showed some early arthritic changes.  (Id.).

On June 12, 2003, plaintiff reported that his shoulder was doing much better on the

---

[25]Keflex is indicated for the treatment of infection.  See PDR at 549.

[26]Naproxen is a non-steroidal anti-inflammatory drug indicated for the treatment of pain associated with arthritis.  See PDR at 2761-62.

Bextra,[27] although his elbow was troubling him again. (Tr. 164). Dr. Almand referred plaintiff to Felix Savoire, M.D., for a second opinion regarding his elbow, and recommended that plaintiff continue with physical therapy. (Id.).

Plaintiff saw Dr. Montesi on July 14, 2003, with complaints of lethargy and some occasional pain in his left leg. (Tr. 176). Dr. Montesi's assessment was: hypertension,[28] intolerant of Toprol.[29] (Id.).

On August 14, 2003, plaintiff complained of left leg muscle pain during physical therapy. (Tr. 175). He also complained of chronic right shoulder pain. (Id.). Plaintiff reported that he walked one to two miles every day. (Id.). Plaintiff had full range of motion of his ankles and knees. (Id.). Dr. Montesi's assessment was bilateral lower extremity pain with muscle spasms. (Id.). He prescribed Norflex and aspirin. (Id.).

Plaintiff saw Dr. Almand for a follow-up of his shoulder on September 18, 2003. (Tr. 163). Plaintiff indicated that his shoulder was doing well, other than the fact that he had some posterior impingement. (Id.). Dr. Almand administered a steroid injection for relief of plaintiff's impingement and bursitis.[30] (Id.).

On September 25, 2003, Dr. Montesi indicated that plaintiff presented asking for disability. (Tr. 175). Dr. Montesi noted that although plaintiff reported some crampy-type pain,

---

[27]Bextra is a non-steroidal anti-inflammatory drug indicated for the treatment of arthritis. See Physician's Desk Reference (PDR), 2577-78 (57th Ed. 2003).

[28]High blood pressure. Stedman's at 855.

[29]Toprol is indicated for the treatment of hypertension. See PDR (61st Ed.) at 668-69.

[30]Inflammation. Stedman's at 262.

he walked two miles to the clinic for each appointment. (<u>Id.</u>). Dr. Montesi indicated that he had observed plaintiff walking in front of the hospital at least three times a month. (<u>Id.</u>). Plaintiff denied any chest pain or shortness of breath. (<u>Id.</u>). Plaintiff had no tenderness or edema of the lower extremities and had full range of motion of his hip, knee, and leg. (<u>Id.</u>). Dr. Montesi's assessment was left lower extremity pain. (<u>Id.</u>). He stated that he did not think he had anything more to offer plaintiff in terms of treatment. (<u>Id.</u>). Dr. Montesi indicated that he would repeat the venogram and release him if it is negative. (<u>Id.</u>).

Plaintiff underwent a left leg venogram on September 26, 2003, which revealed no evidence of deep vein thrombosis. (Tr. 146).

Plaintiff saw Dr. Almand for a follow-up of his shoulder on November 18, 2003. (Tr. 162). Dr. Almand stated that plaintiff's shoulder was doing much better and that plaintiff had full range of motion and full function. (<u>Id.</u>). He returned plaintiff to work full duty. (<u>Id.</u>).

Plaintiff saw Dr. Almand for a follow-up on February 17, 2004, at which time plaintiff reported that his shoulder was doing much better, although he was unable to perform his job duties due to pain. (Tr. 161). Upon examination, plaintiff had full passive and active range of motion of his shoulder and full strength. (<u>Id.</u>). Plaintiff had full range of motion of his cervical spine with no tenderness and a negative impingement sign. (<u>Id.</u>). Dr. Almand stated that overall, plaintiff's examination was "completely normal today despite the fact that he says he has persistent pain in his shoulder." (<u>Id.</u>). Dr. Almand indicated that he told plaintiff that he had nothing else to offer him in terms of treatment. (<u>Id.</u>). He referred him for an impairment evaluation at River City Rehab and discharged him from the clinic. (<u>Id.</u>).

Plaintiff presented to the Veteran's Administration (VA) Medical Center on February 16,

2005, with complaints of hearing loss in his right ear. (Tr. 306). After conducting tests, the audiologist found that plaintiff was "extremely exaggerating" his hearing loss and that his hearing was within normal limits. (Id.).

Plaintiff presented to the emergency room at the VA Medical Center on February 23, 2005, with complaints of chest pain that increased with movement and radiated to his left arm, and shortness of breath. (Tr. 297-99). A medicine history and physical dated February 24, 2005, noted that plaintiff had a history of hypertension and a military injury to the head and shoulders at the age of twenty, with occasional baseline blackouts. (Tr. 287).

Plaintiff was examined by cardiologist Tariq Khan on February 24, 2005. (Tr. 278-82). Plaintiff reported that he had never experienced chest pain before. (Tr. 278). Upon examination, Dr. Khan found no murmur or gallop and noted that plaintiff was in no apparent discomfort or distress. (Tr. 279). Dr. Khan's assessment was hypertension, chest pain, mild troponin[31] elevation, and new onset of exertional angina.[32] (Tr. 280). Dr. Khan recommended aggressive management of plaintiff's exertional angina and prescribed medications. (Tr. 281).

Plaintiff also underwent a nutrition assessment on February 24, 2005, at the VA Medical Center. (Tr. 282-83). The assessment was that plaintiff's weight and BMI indicate obesity, and elevated cholesterol. (Tr. 283). Plaintiff was educated on "heart healthy eating." (Id.).

Plaintiff underwent a cardiac catheterization[33] on February 25, 2005, which revealed triple

---

[31]A central regulatory protein of muscle contraction. Stedman's at 1880.

[32]A severe, often constricting, pain precipitated by physical exertion. Stedman's at 80.

[33]Passage of a catheter into the heart through a vein or artery, to withdraw samples of blood, measure pressures within the heart's chambers or great vessels, and inject contrast media; used mainly in the diagnosis and evaluation of congenital, rheumatic, and coronary artery lesions

vessel disease including RCA,[34] LAD[35] and Lcx.[36]  (Tr. 261-64).  The RCA and LAD were

stented and plaintiff tolerated the procedure well.  (Id.).  Plaintiff was prescribed medications and

was instructed to follow-up regularly with cardiology  (Id.).  It was noted that plaintiff would

return for angioplasty[37] of the mid circumflex.[38]  (Tr. 274).

     Plaintiff presented to the emergency room at the VA Medical Center on February 27,

2005, with complaints of chest pain.  (Tr. 206).  Plaintiff reported that the pain started when he

was walking up steps, went away with rest, and returned at home when at rest.  (Id.).  Plaintiff

indicated that the pain radiated into the left arm, lasted five to ten minutes, and occurred several

times over the course of the day.  (Id.).  Plaintiff reported no history of similar pain.  (Id.).

Kenneth M. Ludmerer, M.D., noted that plaintiff had undergone a cardiac catheterization and that

a follow-up procedure was arranged with cardiology for one month.  (Tr. 209).

     Plaintiff was admitted to the VA medical center for observation on April 29, 2005, after

undergoing a cardiac catheterization.  (Tr. 202).  Plaintiff's diagnosis was coronary artery

disease,[39] status-post left heart catheterization.  (Id.).  Plaintiff presented for a planned

---

and to evaluate systolic and diastolic cardiac function.  Stedman's at 302.

    [34]Right coronary artery.  Stedman's at 146.

    [35]Left anterior descending.  Stedman's at 141.

    [36]Left circumflex coronary artery.  Stedman's at 141.

    [37]Reconstruction of a blood vessel; may involve balloon dilation, mechanical stripping of intima, forceful injection of fibrinolytics, or placement of a stent.  Stedman's at 83.

    [38]Describing an arc of a circle or that which winds around something; denotes several anatomic structures: arteries, veins, nerves, and muscles.  Stedman's at 354.

    [39]Cardiac condition characterized by stenosis (narrowing) of the coronary arteries.  When blood flow is sufficiently compromised to be symptomatic this is called coronary artery

intervention on the circumflex lesion.  (Id.).  Plaintiff reported that he had been feeling much better since his initial cardiac catheterization and denied any exertional chest pain.  (Id.).  Plaintiff indicated that he experienced occasional chest pain when he moved his left arm a certain way, which lasted only until he took his nitroglycerin.  (Id.).  The cardiac catheterization plaintiff underwent that day revealed an 80 percent distal Cx/LPL lesion, which was stented.  (Tr. 204).  It was noted that plaintiff's hypertension was well-controlled with medication.  (Id.).  Plaintiff was continued on his medications and was discharged in good condition.  (Id.).

Plaintiff presented to the VA Medical Center for a scheduled visit with his primary care physician on May 19, 2005.  (Tr. 211-12).  Plaintiff's diagnosis at that time was: coronary artery disease, status post stenting times 2, on plavix[40]; hypertension, stable on meds; and eczema.[41]  (Tr. 213).

## The ALJ's Determination

The ALJ made the following findings:

1.  The claimant met the disability insured status requirements of the Act on September 22, 2002, the date the claimant originally stated he became unable to work, and continued to meet them through September 30, 2003.

2.  The claimant has not engaged in substantial activity since September 22, 2002.

3.  The medical evidence establishes that the claimant by September 30, 2003 had a

---

insufficiency.  If a major coronary artery becomes occluded altogether, this will normally cause necrosis of heart muscle.  Medical treatment (ceasing smoking, lowering cholesterol, taking exercise, etc.) is successful in many cases but surgery may be required.  See Medical Information Systems for Lawyers, § 7:223.

[40]Plavix is an anti-coagulant indicated for the management of acute coronary syndrome. See PDR (61st Ed.) at 917-19.

[41]Inflammatory condition of the skin.  See Stedman's at 566.

history of resolved deep venous thrombosis, a surgically repaired rotator cuff and early arthritis of the elbow, but that he did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 2, Subpart P, Regulations No. 4.

4. The claimant did not have chest pain or shortness of breath on or prior to September 30, 2003. The allegations of symptoms and limitations precluding the ability to perform a full range of light work activities for any period of 12 continuous months beginning by September 30, 2003 are not consistent with the evidence as [a] whole, persuasive or credible.

5. Through at least September 30, 2003, the claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for heavy or strenuous work. He was capable of occasionally lifting up to twenty pounds with no frequent lifting or carrying of more than ten pounds, walking or standing approximately six hours off and on during an eight hour work day, with the remaining time involving intermittent sitting, and if sitting occurred he could push or pull on arm and leg controls. Through his date last insured he had the ability to perform a full range of light work as defined in 20 CFR 404.1567(b) and Social Security Ruling 83-10.

6. The claimant could not perform his past relevant work because it involved heavy exertion.

7. Through at least September 30, 2003, the claimant's residual functional capacity for the full range of light work was not compromised.

8. The claimant was 48 years old on September 30, 2003, which is defined as a younger individual age 45-49 (20 CFR 404.1563).

9. The claimant has the equivalent of a high school education (20 CR 404.1564).

10. The issue of transferable skills is not critical.

11. Based on a capacity for the full range of light work and the claimant's age, education, and work experience, section 404.1569 of Regulations No. 4 and Rules 202.20 to 202.22, Table No. 2, of Appendix 2, Subpart P, Regulations No. 4 direct a finding that the claimant is not disabled regardless of the skill level of his previous work.

12. The claimant was not under a disability, as defined in the Social Security Act, by the time his insured status expired on September 30, 2003 (20 CFR 404.1520(g)).

(Tr. 18-19).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on November 21, 2003, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits under sections 216(i) and 223, respectively, of the Social Security Act, as amended.

(Id.).

## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

**B.     The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or

equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  <u>See id.</u>  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  <u>See id.</u>  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).

**C.**     <u>**Plaintiff's Claims**</u>

Plaintiff raises three claims on appeal of the decision of the Commissioner.  Plaintiff first argues that the ALJ erred in assessing plaintiff's residual functional capacity.  Plaintiff next argues that the ALJ erred in discrediting plaintiff's subjective complaints of pain and limitations.  Plaintiff also argues that the ALJ erred in failing to obtain vocational expert testimony.  The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's credibility analysis.

**1.**     <u>**Credibility Analysis**</u>

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain

and limitation not credible. Defendant contends that the ALJ's credibility determination is supported by substantial evidence in the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880.

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when []he claims that [the pain] hurts so much that it prevents h[im] from engaging in h[is] prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent him from

working are credible.

In his opinion, the ALJ specifically cited the relevant <u>Polaski</u> factors. (Tr. 14-15). The ALJ then properly pointed out <u>Polaski</u> factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ found that the medical evidence does not support plaintiff's subjective complaints. Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. <u>See</u> <u>Curran-Kicksey v. Barnhart</u>, 315 F.3d 964, 968 (8th Cir. 2003).

With regard to plaintiff's heart condition, the ALJ noted that plaintiff's insured status expired on September 30, 2005, prior to plaintiff's diagnosis of coronary artery disease in February of 2005. (Tr. 15, 278-82). The ALJ pointed out that plaintiff first complained of chest pain on February 24, 2005, when he presented at the VA Medical Center emergency room. (Tr. 15, 297-99). Plaintiff had no history of similar pain. (Tr. 278). In fact, Dr. Montesi's treatment notes indicate that plaintiff consistently denied experiencing any chest pain or shortness of breath in 2002 and 2003. (Tr. 175-79).

In order to receive disability insurance benefits an applicant must establish that she was disabled before the expiration of her insured status. <u>See</u> 42 U.S.C. §§ 416(I), 423(c); <u>Pyland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998). Evidence of a disability subsequent to the expiration of one's insured status, however, can be relevant in helping to elucidate a medical condition during the time for which benefits might be rewarded. <u>Pyland</u>, 149 F.3d at 877. In this case, the ALJ properly found that the evidence of plaintiff's heart condition cannot be related back to plaintiff's

date last insured because plaintiff did not experience symptoms prior to his date last insured. See Milton v. Schweiker, 669 F.2d 554, 555 n. 1 (8th Cir. 1982) (a claimant's heart attack subsequent to the expiration of claimant's insured status without evidence of a heart condition during the relevant period cannot serve as a basis for recovering disability benefits).

Plaintiff was treated for an episode of deep venous thrombosis of the left leg in October of 2002. (Tr. 133). A venogram plaintiff underwent on February 5, 2003, revealed improvement since October 2002. (Tr. 157). On April 14, 2003, Dr. Montesi stated that plaintiff had a "little mild blood clot," and that plaintiff reported mild superficial pain when he walked. (Tr. 177). Dr. Montesi pointed out that plaintiff walked three miles back and forth for doctor appointments. (Id.). Dr. Montesi's assessment at that time was "mild superficial phlebitis." (Id.). On April 29, 2003, Dr. Montesi indicated that plaintiff had "very minimal tenderness" of the bilateral lower extremities. (Tr. 176). On July 14, 2003, plaintiff reported only occasional pain in his left leg. (Id.). On August 14, 2003, plaintiff complained of left leg muscle pain, yet reported that he walked one to two miles daily. (Tr. 175). On September 25, 2003, plaintiff presented requesting "disability." (Id.). Dr. Montesi noted that although plaintiff reported some "crampy-type pain," he walked two miles to the clinic for each appointment. (Id.). Upon physical examination, plaintiff had no tenderness or edema of the lower extremities and had full range of motion of his hip, knee, and leg. (Id.). Dr. Montesi's assessment was left lower extremity pain. (Id.). He indicated that there was nothing more he could do for plaintiff at that time. (Id.). A venogram plaintiff underwent on September 26, 2003, revealed no evidence of deep vein thrombosis. (Tr. 146).

With respect to plaintiff's rotator cuff injury, the ALJ noted that it was surgically repaired

on February 5, 2003.  (Tr. 16, 170-72).  In May and June of 2003, plaintiff reported that his shoulder was doing well.  (Tr. 166, 164).  In September of 2003, plaintiff indicated that his shoulder was doing well, although he had some posterior impingement.  (Tr. 163).  On November 18, 2003, Dr. Almand found that plaintiff had full range of motion and full function of his shoulder and returned plaintiff to full duty.  (Tr. 162).  Although plaintiff complained that he was unable to perform his job duties due to pain on February 17, 2004, Dr. Almand found that plaintiff had full range of motion and full strength.  (Tr. 161).  Dr. Almand stated that plaintiff's examination was "completely normal" despite plaintiff's complaints of pain.  (Id.).

Finally, the ALJ considered plaintiff's elbow problems.  (Tr. 17).  The ALJ noted that an examination of plaintiff's elbow in May 2003 showed no pain and no instability.  (Tr. 17, 165). An x-ray revealed degenerative changes of the right elbow.  (Tr. 155).  Plaintiff indicated that his elbow symptoms were progressing well with therapy.  (Tr. 165).

The ALJ next discussed inconsistencies in the record, which detract from plaintiff's credibility.  The ALJ pointed out that despite plaintiff's complaints of leg pain, he was able to walk several miles to attend medical appointments.  (Tr. 16).  Dr. Montesi made several references to plaintiff's ability to walk long distances.  (Tr. 175, 177).  Significant daily activities may be inconsistent with claims of disabling pain.  See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).  As such, the ALJ properly determined that plaintiff's well-documented ability to walk long distances on a regular basis was inconsistent with his allegation of disabling pain.

The ALJ also considered the fact that plaintiff did not seek treatment from February 2004 through February 2005, when he reported new symptoms of chest pain.  (Tr. 17).  This is an appropriate consideration, because the fact that a plaintiff fails to seek regular medical treatment

disfavors a finding of disability.  See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).

The ALJ also noted that none of plaintiff's treating physicians expressed the opinion that plaintiff was unable to work or that plaintiff had any functional limitations.  (Tr. 17).  In fact, although plaintiff requested documentation in support of his disability application from both Dr. Montesi and Dr. Almand, neither physician assisted plaintiff.  Rather, both physicians released plaintiff from their care at that time.  (Tr. 161, 175).  Dr. Almand released plaintiff to full duty.  (Tr. 162).  The presence or absence of functional limitations is an appropriate Polaski factor, and "[t]he lack of physical restrictions militates against a finding of total disability."  Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999)(citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993)).

An administrative opinion must establish that the ALJ considered the appropriate factors.  See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001).  However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints.  See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).  In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not credible is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 2.    Residual Functional Capacity

Plaintiff argues that the ALJ erred in assessing his residual functional capacity.  Specifically, plaintiff contends that the ALJ did not consider all of plaintiff's medically determinable impairments in assessing his residual functional capacity.  Plaintiff argues that

because of these deficiencies, the record was not fully developed and the ALJ's residual functional capacity is therefore flawed. Defendant contends that the ALJ's residual functional capacity determination is supported by substantial evidence.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

It is true that the ALJ has a duty to fully develop the record, particularly where a claimant is not represented by counsel. See Driggins v. Harris, 657 F.2d 187, 188 (8th Cir. 1981). This inquiry, however, is limited to whether the claimant was prejudiced or unfairly treated by the ALJ's development of the record. See Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993). "An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1999) (quoting Naber v. Shalala, 22 F.3d 186, 189 (8th Cir. 1994)). Further, no error exists where there is substantial medical evidence in the record, particularly by treating source physicians, which strongly supports an ALJ's decision. See Isaacs v. Barnhart, 196 F. Supp.2d 934, 942 (D. Neb. 2001) (citing Haley 258 F.3d at 749-750).

After summarizing the medical evidence and discussing plaintiff's credibility, the ALJ concluded as follows:

> Based on all of the above, it is found that the claimant could not engage in heavy or strenuous work, but that he could perform a full range of light work as defined in Regulations and Rulings. Light work involves lifting no more than twenty pounds with no frequent lifting or carrying in excess of ten pounds. Light work can require walking or standing, approximately six hours off and on during an eight hour work day, with the remaining time involving intermittent sitting. If sitting occurs most of the time there will be some pushing or pulling of arm or leg controls. *See* 20 CFR 404.1567(b) and Social Security Ruling 83-10. With his history of a right rotator cuff repair, heavy lifting and carrying would not be a good idea. However there was nothing wrong with him to prevent the light lifting and carrying of up to 10 pounds frequently and 20 pounds occasionally required in light work. His leg symptoms were mild to minimal and only occasional and would not have prevented him from doing the standing and walking or leg control operation required in light work.

Substantial evidence exists in the record to support the ALJ's assessment of residual functional capacity. As previously discussed, the objective medical evidence reveals that plaintiff's shoulder and leg impairments were successfully treated and plaintiff's heart symptoms did not begin until well after plaintiff's date last insured.

Plaintiff does not claim that the record is supportive of a disabling shoulder or leg impairment. Rather, plaintiff contends that the ALJ failed to develop the record regarding blackouts plaintiff experienced as a result of a head injury sustained twenty years ago while in the service. The only reference to blackouts in the medical record is contained in a VA Medical Center record dated February 24, 2005, when plaintiff presented with complaints of chest pains. (Tr. 285). Under plaintiff's past medical history is a notation that plaintiff sustained a head and shoulder injury in the service at the age of 20 with complaints of occasional blackouts and headaches at baseline since the accident. (Id.). There is no other mention of blackouts in the medical record. Plaintiff did not complain of blackouts to any of his treating physicians prior to

his date last insured.  As such, the ALJ was not obligated to further develop the record regarding blackouts.

The medical evidence discussed above substantially supports the ALJ's residual functional capacity assessment that plaintiff can perform the full range of light work activity.  Notably, both of plaintiff's treating physicians released him from their care, and Dr. Almand concluded that plaintiff was able to return to work with no restrictions.  In light of this substantial medical evidence, there was no need for the ALJ to order any additional examination to further develop the record and the failure to do so neither prejudiced plaintiff nor treated plaintiff unfairly.  Thus, the ALJ's residual functional capacity assessment is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

**3.    Vocational Expert Testimony**

Plaintiff finally argues that the ALJ erred by using the Medical-Vocational Guidelines instead of obtaining vocational expert testimony because the ALJ failed to properly consider plaintiff's reaching limitation and blackouts as non-exertional impairments.  Plaintiff contends that the ALJ's use of the Medical-Vocational Guidelines, commonly known as the "Grids," to determine that plaintiff was capable of performing other work, was error.  Plaintiff argues that once a non-exertional impairment is shown to exist, vocational expert testimony is required.

As set forth above, once a claimant establishes that he or she is unable to return to past relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy.  The Commissioner may rely on the Medical-Vocational Guidelines to show the availability of work in certain limited circumstances.

See Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999). "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'Grids,' which are fact-based generalization[s] about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Id. (quotation omitted). Use of the guidelines is permissible only if the claimant's characteristics identically match those contained in grids and only if the claimant does not have non-exertional impairments. See Foreman v. Callahan, 122 F.3d 24, 25 (8th Cir. 1997).

As explained by the Eighth Circuit, "[t]he grids [] do not accurately reflect the availability of jobs to people whose impairments are nonexertional, and who therefore cannot perform the full range of work contemplated within each table." Id. at 26. Accordingly, the Eighth Circuit requires "the Commissioner [to] meet his burden of proving that jobs are available for a significantly nonexertionally impaired applicant by adducing the testimony of a vocational expert." Id. "[W]here a claimant suffers from a nonexertional impairment which substantially limits his ability to perform gainful activity, the grid cannot take the place of expert vocational testimony." Id. (alteration in original) (quoting Talbott v. Bowen, 821 F.2d 511, 515 (8th Cir. 1987)). "Thus, if a claimant's ability to perform the full range of work in a particular category is limited by a non-exertional impairment, the ALJ cannot rely exclusively on the grids to determine disability but must consider vocational expert testimony." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

Here, the ALJ's use of the grids was permissible. The ALJ found that despite his shoulder injury and pain, plaintiff possessed the residual functional capacity to perform the full range of

light work. (Tr. 17). As discussed above, the ALJ's residual functional capacity determination is supported by substantial evidence. The record does not support any greater restrictions due to blackouts. Thus, the ALJ's use of the grids to find plaintiff could perform a significant number of jobs in the national economy is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## **RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's application for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act be **affirmed**.

The parties are advised that they have eleven (11) days, until August 28, 2007, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this ___17th___ day of August, 2007.

_Lewis M. Blanton_

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE